**Gail L. SAVAGE, Appellant,**

v.

**John F. SAVAGE, Appellee.**

Superior Court of Pennsylvania.

Argued June 16, 1999.

Filed Aug. 4, 1999.

John J. Connelly, Jr., Harrisburg, for appellant.

Robin Levengood, Reading, for appellee.

Before DEL SOLE, STEVENS, JJ., and CIRILLO, President Judge Emeritus:

CIRILLO, President Judge Emeritus:

¶ 1 Gail L. Savage ("Wife") appeals from the February 17, 1998 order of the Court of Common Pleas of Berks County bifurcating the parties' claim for divorce from their economic claims, issuing a decree in divorce, and reserving jurisdiction over all economic and ancillary issues. We affirm the bifurcated divorce decree. However, we find it necessary to remand because the trial court took certain actions without jurisdiction during the pendency of this appeal.

¶ 2 This is a lengthy, procedurally complex, and contentious divorce action. The parties were married in 1974. Wife filed a complaint in divorce twenty years later through her first attorney in this matter. The complaint stated the no-fault ground of irretrievable breakdown,[1] the fault ground of indignities to herself as the innocent and injured spouse,[2] and included claims for divorce, equitable distribution, counsel fees, costs and expenses, alimony

pendente lite (APL), alimony, and interim relief. The case was immediately assigned to the Honorable Peter W. Schmehl of the Berks County Court of Common Pleas, who has presided over the case ever since. John F. Savage ("Husband") accepted service through his attorney and then filed an answer, new matter, and counterclaim. He contested that the marriage was irretrievably broken, and though he effectively admitted indignities, he contested who was at fault. Marital counseling was requested by neither party at that or any other time.

¶ 3 A summary of the extensive proceedings prior to bifurcation follows. The first interim order was issued immediately after the complaint was filed; it prohibited Husband from dissipating marital assets or changing insurance coverage.[3] A hearing was held three months later at which the parties resolved this matter by stipulation. The following month Wife petitioned for contempt, and a second attorney entered his appearance as co-counsel for Wife. The contempt matter was then also resolved by agreement.

¶ 4 This pattern was thereafter repeated. Through a third attorney,[4] Wife petitioned for special relief regarding Husband's payment of the mortgage delinquency on the marital residence where she was living. Husband agreed to pay the mortgage delinquency after a hearing. Noting the completion of discovery, Husband next moved for appointment of a special master;[5] one was appointed, but

---

1. Pursuant to 23 Pa.C.S. § 3301(d).

2. Pursuant to 23 Pa.C.S. § 3301(a)(6).

3. The primary sources of income during the marriage were Husband's closely held businesses, "Savage Hyundai," "Savage Sales," and "Savage Properties" in Shillington. It appears, though the record is unclear, that Husband was paying Wife spousal support throughout this action. Separately docketed actions not before us today appear to have existed on various ancillary issues including support (spousal and/or child) and custody of the parties' daughter, now an adult in college. We are unaware whether these cases were also presided over by Judge Schmehl.

4. No withdrawal of either prior co-counsel, nor entry of this attorney, is found in the record. However, only third attorney and her firm are listed as counsel on both Wife's and Husband's pleadings from this time until they withdrew as discussed below. The first two attorneys, however, remained listed as co-counsel of record during this period.

5. The Master was appointed with respect to the claim of divorce, as per 23 Pa.C.S. section 3301(d)(1)(ii) and Pa.R.C.P.1920.51(a)(2), together with the economic claims including alimony, alimony pendente lite, equitable distribution, counsel fees, and costs and expenses.

Wife petitioned to vacate the appointment, stating Husband had misrepresented the completeness of discovery. Wife then petitioned for contempt, averring that mortgage foreclosure proceedings had commenced. The parties resolved the contempt by agreement that Husband would pay the mortgage delinquency in exchange for a credit at equitable distribution, that Wife would make the monthly mortgage payments, and that discovery was not yet complete.

¶ 5 A named partner from the same firm as Wife's third lawyer then entered his appearance for Wife. This fourth attorney acted as co-counsel with her third attorney.[6] For no apparent reason, a different Master was then appointed to replace the first. His appointment was immediately vacated and a third Master appointed.[7] Proceedings finally commenced before this third Master, who held approximately 12 hearings over the next 11 months simultaneously with the following proceedings in the trial court.

¶ 6 On October 8, 1997, Wife filed an emergency petition for contempt of an unknown nature.[8] The petition was apparently related to an incident during which Wife had intentionally driven and crashed into the vehicle in which Husband and the parties' daughter were riding, at a time when a protection from abuse order was in effect preventing contact between Wife and Husband.[9] The court entered an order requiring Husband to provide Wife a car for a week while her damaged one was being repaired.[10] It appears Wife was later convicted of criminal charges and placed on probation as a result of this incident.[11]

¶ 7 Husband then filed a petition to bifurcate claims under Pa.R.C.P.1920.52(c), together with a proposed bifurcation order and divorce decree, eventually granted (with modifications) and before us today. It had been three years and ten months since Wife had filed the complaint in divorce. The court soon issued an order staying the decision on Husband's petition to bifurcate, however, pending resolution of the issue of Wife's legal competency.

¶ 8 At this time, the court placed in the record a memorandum stating that the Master had earlier approached the bench with his concern that Wife might not be able fully to comprehend the case's economic matters, nor to negotiate a fair agreement, due to potential mental and emotional problems which had shown themselves during several Master's hearings.[12] Upon inquiry, the court received acknowledgements from counsel for both

---

6. At this time, however, official court printouts recorded all four attorneys (at three firms) representing Wife.

7. Both were appointed with respect to the same claims as the previous Master. We can find no order in the record vacating the first Master's appointment.

8. This pleading cannot be found in the record but is docketed and has been described elsewhere in the record.

9. Pursuant to the Protection from Abuse Act, 23 Pa.C.S. §§ 6101 et seq. This proceeding was evidently separately docketed and is also not included in the present record. The record contains repeated descriptions of it, however.

10. Husband had earlier been ordered to provide Wife with a car, insurance, and gasoline, which he was apparently complying with at the time.

11. We have no indication of what statutes she was convicted of violating. Again, the criminal proceeding is not before us and was separately docketed. However, repeated references to the conviction are contained in the record.

12. This appears to have been, in effect, a petition under 20 Pa.C.S. chapter 55, "Incapacitated Persons." See Pa.R.C.P.2051–2064 (relevant procedures). See also Syno v. Syno, 406 Pa.Super. 218, 594 A.2d 307 (1991), reconsidering post-decree 389 Pa.Super. 505, 567 A.2d 717 (1989) (incompetent person may not maintain divorce action absent guardian; procedures). Additionally, the court tells us that Wife had refused to remain on the stand for cross-examination during more than one Master's hearing.

sides that such might well be the case. The court stated that all such opinions had been offered, in its opinion,

> with the best interests and welfare of Mrs. Savage rising above all other considerations. Counsel for the parties advised that a settlement of all outstanding issues, equitable distribution, support, etc., was on the table. All counsel believed the settlement proposal to be fair but were very concerned about anything that Mrs. Savage might agree to if indeed she was incapacitated. The Court, in its continuing concern here and in an attempt to resolve this matter, appointed Attorney Ralli Holden to review the proposed settlement, with her sole purpose being to satisfy herself, and thereafter the Court, that it was a fair and appropriate settlement with regard to Mrs. Savage, or not so.

Before evaluating its fairness, however, after speaking with Wife, Attorney Holden also expressed concerns about Wife's competence. According to the court, she stated that "any decision she would make with regard to the fairness of the agreement or lack thereof would be the product of a *sui juris* [13] individual." The court therefore stayed all proceedings, including the Master's, and ordered Robert Sadoff, M.D., a forensic psychiatrist, to perform a psychiatric evaluation of Wife. Dr. Sadoff's report [14] revealed that Wife suffered from an anxiety disorder with panic attacks and post-traumatic stress disorder (PTSD) possibly triggered by the spousal abuse she alleged had occurred and by her po-

tentially inappropriate psychiatric institutionalization and treatment in the 1960's, among other causes. He stated that she was in need of intensive and long-term treatment and noted the agreement of other specialists as to this diagnosis. However, Dr. Sadoff concluded that Wife was legally competent, stating:

> It is my opinion, within reasonable medical certainty that Ms. Savage is mentally competent to proceed legally. She understands the nature and consequences of her current legal situation and she can work with counsel in preparing her case, and she is well oriented, and her memory is not impaired.

He recommended that the court be sensitive to the fact that Wife was likely to panic or become anxious periodically and that the court at these times allow her to rest. Upon receipt of this report, the court found the competency matter resolved, allowed the Master's hearings to recommence, and scheduled a hearing on bifurcation. [15]

¶ 9 Bifurcation was thus to have been taken up at the January 6, 1998 scheduled hearing. However, on that date it became clear that the parties had negotiated a partial settlement of the economic claims. They therefore used the hearing to place on the record, before the court, those paragraphs as to which they agreed, and those they would need to negotiate further. One of the provisions was Wife's receipt of a $100,000.00 advance on equitable distribution from Husband, and the record indi-

---

13. An individual *sui juris* is his or her own master and is not under any legal disability or incapacity. *Black's Law Dictionary* (6 th ed.1991) 1434. We presume the court instead intended to use the phrase *non sui juris,* not his or her own master, indicating that a person is incompetent. *Black's* 1058.

14. Dr. Sadoff's evaluation is accompanied by Wife's signed request that it be made part of the record, is not sealed, and begins with Dr. Sadoff's noting that from the start of the interview, Wife understood the report would not be kept confidential.

15. Wife then stated in another emergency special relief petition that the furnace in the marital home had ceased to function and that Husband had refused to pay to replace it. Husband answered that Wife had the ability and duty to pay for home maintenance out of her spousal support. The court immediately issued an order that Husband was to pay for the installation of a new furnace and would receive a credit at equitable distribution. The court has stated that it also held a hearing during which the issue was whether Husband would be obligated to repair the pool; we are unaware of the outcome of this proceeding.

cates Husband did deliver this sum to Wife at that time. However, the terms of the agreement turned out to be unacceptable to the parties, and the matter was soon rescheduled for further hearings by the Special Master.

¶ 10 Since the bifurcation petition was still outstanding, further proceedings were then scheduled, but Wife soon moved for a continuance because she intended to attend an inpatient treatment facility for PTSD for several weeks on the recommendation of her physician. The hearing on bifurcation was rescheduled for February 17, 1998 to accommodate her.

¶ 11 The bifurcation hearing occurred on February 17, 1998. It is this proceeding and the order entered at its close which is before us on appeal.

¶ 12 A review of the transcript and the record reveals that at the beginning of the hearing, the court was handed a petition to withdraw from both attorneys for Wife (her third and fourth).[16] Counsel had informed Wife prior to the hearing that they would be withdrawing. Wife initially responded that she was not prepared to represent herself, did not have other counsel, and opposed withdrawal; she also requested another continuance.[17] Counsel for Husband opposed Wife's attorneys' withdrawal because it would further delay the resolution of the case. He also represent-

ed that a follow-up Master's hearing was scheduled for three weeks following this bifurcation hearing, and that, after four years, there was finally a real possibility of fully settling the case at that hearing.

¶ 13 The court determined that due to the already extensive delays in the case, the bifurcation hearing would be held without further continuance. It offered Wife the choice of having her attorneys represent her at the proceeding or of representing herself. Wife chose to "wing it," as she said, but stated that she did not know the law and could not find another attorney.[18] The court then granted her attorneys' petition for withdrawal but specifically requested that they remain in the courtroom. The court has indicated in its opinion that Wife's psychologist was also in attendance at this proceeding. Judge Schmehl also at this time exhorted Wife to procure counsel for the upcoming Master's hearing.

¶ 14 The bifurcation hearing then commenced. Husband testified that since the parties' separation on January 14, 1994, they had not resumed cohabitation. Husband also testified that since that date he had either paid the mortgage and expenses on the marital residence, or a spousal support order of $730.00 per week.[19] He testified that the marriage was irretrievably broken and that the parties had lived separately for more than two years.[20] Hus-

---

16. The petition averred that attorney-client communications had broken down, and that Wife: had failed to consult with counsel and/or to follow counsel's advice before taking unilateral action; had made repeated statements that she would not follow counsel's advice and was prepared to represent herself; had failed to obtain substitute counsel despite current counsel's repeated requests; and had failed to pay any portion of the attorneys' bill.

17. She added that her attorneys had forced her to sign documents she did not wish to sign and that she could not work with them.

18. She also stated her understanding that "winging it" was different than representing herself and refused to do the latter.

19. Pursuant to docket 94–0126–0–8.

20. At this point Wife objected, demanded a continuance, refused to accept the court's ruling thereon, questioned the court's authority, demanded recusal, stated she would be unable to procure counsel for the Master's hearing in three weeks, stated that Husband had cohabited with her twice since the date of separation, and accused the judge of bias. The penultimate matter was not in evidence, but to the extent that the court considered Wife's allegation, as fact-finder it clearly resolved the issue on grounds of credibility finding a separation of at least two years. The Master later found no cohabitation since January 14, 1994, and the parties agreed the marriage was irretrievably broken. We note that no affidavit of grounds under section 3301(d) of the Divorce Code was filed pursuant to Pa.R.C.P.1920.42. However, this was filed as a contested action under section

band was then questioned as to whether Wife had verbally abused him during the marriage.[21]

¶ 15 Husband testified that he now also believed the marriage was irretrievably broken, as stated in Wife's complaint, and he expressed his desire to be divorced from Wife.[22] He noted that she had physically abused him. He stated he was prepared to resolve the ancillary issues at the upcoming Master's hearings. Husband stated he would continue paying the agreed amount of support/alimony to Wife until the court entered an order or orders adjudicating all remaining economic and ancillary claims. He stated he would take no action to hide or dissipate marital assets. He expressed his intent to obligate his estate in the event of his death prior to final adjudication of the economic claims. He denied requesting bifurcation due to a desire to avoid economic obligations to Wife. The court asked if he would be willing to continue paying for Wife's medical insurance and unreimbursed medical expenses as he had been doing; Husband indicated he would.

¶ 16 Wife then cross-examined Husband.[23] When asked by the court to utilize questions to cross-examine the witness on the issue of bifurcation, she requested and was granted a ten-minute recess. Upon returning, Wife questioned why Husband wished a bifurcated divorce. He responded that he wished to get on with his life and that he did not believe that a resolution of the economic claims would occur in the near future despite the upcoming Master's hearing. Wife then engaged in a line of questioning relating to Husband's past compliance with his agreement to pay for her medical expenses.[24]

¶ 17 Wife then asked what bifurcation was. The court responded, patiently explaining that although a divorce decree would be entered now, the economic issues would be preserved and settled or litigated later.[25] The court again asked Wife to

3301(d)(1)(ii), to which Rule 1920.42 does not apply. 23 Pa.C.S. § 3301(d)(1)(ii).

21. Wife again interrupted the proceedings at this time. After the court warned her of the penalties for contempt, Wife ceased her interruption.

22. Husband thereby dropped his previous opposition to the section 3301(d) no-fault divorce grounds stated in Wife's divorce complaint. 23 Pa.C.S. § 3301(d).

23. She first attempted to cast doubt upon *Husband's allegation that she had physically abused him.* She then attempted to show that Husband had cashed medical reimbursement checks; however, she was unable to do so effectively, as she ceased to ask questions and began to testify, to which opposing counsel's evidentiary objections were sustained.

Wife next stated outright that it was her desire to be divorced and to enforce the agreement she contended had been finally entered at the January, 1998 proceeding. She offered finally to settle the case. Husband wished to accept this offer, but Wife's standby counsel objected.

Wife then engaged in another outburst. She stated her California PTSD treatment was for physical abuse by Husband, demanded recusal of Judge Schmehl, accused Husband of adultery and dissipation of marital assets, and accused the court of being abusive to her.

24. Wife asked whether Husband had taken for his own use several reimbursement payments for her medical bills. Husband responded that he had not. As to the specific queries, he stated he had never received reimbursement, since when he had submitted these bills, the claims had been rejected due to those doctors not participating in their health plan. Whether Husband had at the time agreed to pay for unreimbursed medical expenses, and, if so, whether he did pay, is *not clear on the record.* After further similar questioning, Husband's attorney objected that Wife's claims as to these allegations were preserved, as were any such economic issues, which could be litigated or settled separately. Again, the court resolved the issue of a pattern of non-compliance in favor of Husband, *for the objection was sustained and Wife was asked to move on.*

25. Wife next again attempted to show that a final agreement as to the economic issues had already been reached in January of 1998. Husband countered, and the court repeated that a final agreement had not been reached at that time. It appears that Wife then had the sort of panic attack which had been described by Dr. Sadoff, stating that she could

focus on the issue of bifurcation. Wife then asked Husband whether he had told her that once he obtained a bifurcated divorce decree, he would not cooperate in settling the economic claims. Husband denied so stating.

¶ 18 At this juncture, Wife offered to negotiate a modification to what she continued to state had been a final agreement in January, consented to an agreement after negotiation, then withdrew her consent suddenly.[26] The court asked Wife whether she had other questions on cross-examination of Husband regarding bifurcation. Wife attempted to question Husband regarding an alleged prior statement regarding his political connections to the judge, but objections to this line of inquiry were sustained.

¶ 19 Wife then indicated her desire to testify and took the stand. The court instructed her to testify only regarding bifurcation and explained this. Wife then made a statement regarding her attorneys' bills, the bias of the judge, and her recusal request. After she engaged in what could be characterized as a dialogue with the judge, the judge made the following well-reasoned statement:

> THE COURT: The record should reflect at this time that I am allowing this witness to disrupt the proceedings of this court for over two hours today. She refuses to stay on point; she refuses to address the issues before the Court. She has made regular assertions about me that the record will reflect simply are not the case. Her husband has testified[,] as has [his] attorney[,] there indeed was no agreement on January the sixth and that is indeed what the record would reflect and the transcript would reflect when this mess goes—as I am sure it will—to the Superior Court. In the meantime I am asking [you] once again please, to.testify about the bifurcation and your objection or your agreement to the termination of your marriage today.
>
> GAIL L. SAVAGE: I don't know what to say. So that's it, I guess.

¶ 20 Husband's counsel then presented Wife and the court with his proposed order for bifurcation and decree in divorce. It contained several provisions to protect Wife's economic interests.[27] The court noted the absence of a detailed provision for Husband continuing to cover Wife's medical insurance and non-covered medical

> not breathe due to the abusive judge. She requested recusal again, which was denied. She did not at this time request another recess.
>
> Wife again questioned Husband as to whether a final agreement had been reached on January 6, 1998. The court stated again that at that time, the parties had agreed to certain provisions of a proposed agreement while stating their lack of agreement on certain other provisions.

26. The court and Husband expressed interest in Wife's initial offer to negotiate; Wife then agreed to negotiate with Husband's counsel without the benefit of her own counsel. Wife's standby counsel at this time requested to be released. Judge Schmehl granted the parties fifteen minutes as requested to negotiate a final settlement of all claims. He simultaneously released standby counsel for Wife. The court later issued a short memorandum and order adequately detailing counsel's withdrawal request and the grant thereof. Ten

> minutes later, Husband's counsel indicated Wife was in agreement with Husband's proposal. The terms of the agreement began to be read into the record, but Wife then objected, stating that she wished not to have an agreement read into the record but an actual written agreement. Husband's counsel agreed to pay for a transcript. Wife then stated that she had changed her mind. Husband's counsel requested the agreement be stricken from the record, and it was. Wife stated that she had only agreed to settle under duress and due to her great fear of Judge Schmehl. She repeated this several times and accused the court of prejudice.

27. These included continued payment of APL in the amount of $730.00 per week until all economic and ancillary issues were finally resolved, a provision obligating Husband's estate should he die before resolution of all claims, and a provision that, in the event of Wife's death before resolution of all claims, her estate would be entitled to APL.

bills. Such a provision, covering insurance and up to $5,000.00 per year of unreimbursed medical expenses, was added by hand. The order was then approved and entered by the court, granting bifurcation, preserving the economic claims, and granting a divorce on grounds of 3301(d), irretrievable breakdown.

¶ 21 The foregoing order is before us on appeal.

¶ 22 The following actions were taken after the order before us was entered, but before Wife filed her notice of appeal.

¶ 23 On March 2, 1998, Wife filed a voluminous *pro se* petition for declaratory judgment, requesting that the bifurcation order and divorce be voided, that the January 6, 1998 alleged agreement be enforced, and that Judge Schmehl recuse himself. On March 9, 1998, the court dismissed this petition for failure to comply with the Rules of Civil Procedure but directed the Master to hear any issues raised therein that related to the economic claims.

¶ 24 On March 9, 1998, late in the day, Wife filed with the Prothonotary a *pro se* motion for a continuance of the Master's hearing scheduled for the following day. The motion was based primarily on Wife's stated inability to find new counsel.· It was not disposed of at this time.[28] However, the following day, March 10, 1998, the Master's hearing was held as previously scheduled. Wife was now represented by a fifth attorney, she was fully prepared to proceed, and did. A transcript of the proceedings is of record, and no mention is made of her continuance motion. The par-

ties at that time had reached an agreement, and it was read into the record. The Master questioned Husband and Wife and ensured that both fully understood and consented to the agreement and that they realized the agreement was final as orally read into the record and that the transcript would be filed with the Master's report. Attached to the transcript is a proposal from Husband's attorney dated March 9, 1998, in part the basis of the agreement, for it includes the listing of the assets upon which the parties based their settlement.

¶ 25 On March 13, 1998, Wife filed a timely *pro se* notice of appeal from the order bifurcating the proceedings and issuing a decree in divorce.[29] The notice of appeal was filed after the Master's proceedings had occurred but before his report had been transcribed or filed. This appeal was docketed at # 409 Harrisburg 1998.[30]

¶ 26 The following actions were taken in the trial court after Wife filed her notice of appeal.

¶ 27 The Master's report was filed on March 24, 1998. It detailed what had occurred at the March 10, 1998 proceedings and included the transcript thereof. The Master recommended that the economic claims be resolved as per the agreement, and he submitted a proposed order and divorce decree for entry by the court which included the terms of the aforementioned agreement.[31] Wife filed no exceptions to the Master's report. On April 14, 1998, Judge Schmehl signed the Master's proposed Order and Decree, purporting to

---

**28.** *See* discussion *infra.*

**29.** It is this notice of appeal that eventually made its way to us.

**30.** On March 25, 1998, Wife also filed a *pro se* notice of appeal of the court's March 9 denial of her *pro se* petition for declaratory judgment. This was docketed at # 472 Harrisburg 1998. On April 7, 1998, Wife filed a *pro se* notice of appeal of the then-filed Master's report. This appeal was docketed at # 529 Harrisburg 1998. Shortly thereafter, Hus-

band filed with this court motions to quash Wife's appeals at dockets # 472 and 529. Our court quashed the two later appeals but retained the appeal before us.

**31.** The Master noted that the parties had been divorced by the trial court and that Wife had taken an appeal. Nonetheless, he recommended "that the parties be divorced" and included in his proposed order a provision divorcing the parties.

divorce the parties for the second time, and issued the following statement:

The Court has signed the Order and Decree submitted to it by the Special Master, the parties having entered into an agreement resolving all of the economic issues in a hearing before the Special Master and no timely appeal having been taken from that agreement, where, coincidentally, both parties were represented by legal counsel.

However, the Plaintiff, Gail. L. Savage, has filed an appeal from this Court's order of bifurcation dated February 17, 1998 decreeing the parties divorced. Until the appeal has been resolved, this Order should only, therefore, deal with the economic issues, which the Court believes to be resolved herewith.

¶ 28 Additionally, regarding another matter, on March 26, 1998, the court issued the following order:

AND NOW, this 26th day of May, 1998, in order to clarify the record and due to Plaintiff's filing her Motion for Continuance too late for the Court to address prior to the scheduled Master's hearing and in light of the fact that no motion was made directly before the Court on the morning of the Master's hearing by either Plaintiff or the attorney representing her that day, the Motion for Continuance filed on March 9, 1998 is DENIED.

¶ 29 On March 31, Wife's fifth attorney (who had appeared only at the Master's proceeding) petitioned for withdrawal, averring that Wife had filed pleadings without his knowledge and against his advice. A hearing was scheduled for April, at which time withdrawal was granted.

¶ 30 In late April of 1998, Wife filed another emergency petition for contempt and special relief. The court scheduled a hearing thereon. On that date, the court issued a brief order continuing the matter in light of Wife's failure to appear. The court also noted its concern that it might not have jurisdiction due to the matter being on appeal.

¶ 31 The present appeal was dismissed in May of 1998 due to Wife's bankruptcy.[32] On December 2, 1998, it was reinstated. Wife is represented by a different attorney on appeal, her seventh. Husband has retained a different attorney for appeal, his second.

¶ 32 Wife presents for our review the following questions:

1. Whether the trial court's decision to bifurcate the divorce between the parties[,] in disregard of the applicable standard enunciated in *Wolk v. Wolk* [, 318 Pa.Super. 311, 464 A.2d 1359 (1983),] and its progeny governing decisions to bifurcate[,] constitutes an abuse of discretion?

2. Whether the trial court erred by entering the order and decree submitted by the special master and by denying appellant's motion for a continuance of the Master's Hearing after the court had been divested of jurisdiction following appellant's filing of a notice of appeal of the decision to bifurcate?

¶ 33 It is well settled that a divorce decree entered pursuant to or simultaneously with an order bifurcating the divorce from the economic claims is final and appealable. *Caplan v. Caplan*, 713 A.2d 674, 676 (Pa.Super.1998); *Curran v. Curran*, 446 Pa.Super. 633, 667 A.2d 1155, 1156 (1995); *Flowers v. Flowers*, 417 Pa.Super. 528, 612 A.2d 1064, 1065 (1992). This contrasts starkly with a bifurcation order prior to entry of a divorce decree,

32. In May of 1998, both we and the trial court were notified by Wife's sixth attorney that Wife had filed for bankruptcy in the bankruptcy court; this attorney therefore filed a stay of further proceedings as per B.R.C.P. Rule 20 and 11 U.S.C. § 362(a). On June 1, 1998, the present appeal was dismissed without prejudice to the right to file for reinstatement of the appeal in the event bankruptcy proceedings were concluded. A week later, Judge Schmehl stayed trial court proceedings pending the outcome of bankruptcy proceedings.

which is interlocutory and not a final order.[33] *Mosier v. Mosier*, 359 Pa.Super. 187, 518 A.2d 843 (1986); *Beasley v. Beasley*, 348 Pa.Super. 124, 501 A.2d 679 (1985); *Mandia v. Mandia*, 341 Pa.Super. 116, 491 A.2d 177 (1985). While it was previously necessary to follow post-trial procedures in order to preserve a challenge to bifurcation for our review, post-trial practice in domestic relations has been abolished except for paternity jury cases. Pa.R.C.P. 1930.2, effective July 1, 1994; *Mosier, supra.* The present case is, therefore, properly before us.

¶ 34 We review bifurcation orders under an abuse of discretion standard. *Wolk, supra,* 464 A.2d at 1362. In order to determine whether the trial court has exercised its discretion soundly in granting bifurcation, we must examine the authority for and requirements of that procedure.

¶ 35 Bifurcation, the severance of divorce claims from economic claims, is authorized by the Divorce Code. *Curran, supra* (quoting *Fenstermaker v. Fenstermaker*, 348 Pa.Super. 237, 502 A.2d 185, 191 (1985)). Our Rules of Civil Procedure recognize that:

> (d) The court need not determine all claims at one time but may enter a decree adjudicating a specific claim or claims.

Pa.R.C.P.1920.52(d), adopted March 30, 1994, effective July 1, 1994. Additionally, the Divorce Code contains the following recognition of the procedure:

> **Bifurcation.**—In the event that the court is unable for any reason to determine and dispose of the matters provided for in subsection (b) [ancillary claims] within 30 days after the report of the

master has been filed, it may enter a decree of divorce or annulment. Upon the request of either party and after a hearing, the court may order alimony *pendente lite*, reasonable counsel fees, costs and expenses and may make a temporary order necessary to protect the interests of the parties pending final disposition of the matters in subsection (b).

23 Pa.C.S. § 3323(c). The above-quoted section of the Divorce Code is not to be read literally, so as to authorize bifurcation only after a Master's report has been filed; it does not "restrict the court from making a determination on bifurcation before a Master's report has been filed or in instances where a Master is not involved." *Mosier v. Mosier*, 359 Pa.Super. 187, 518 A.2d 843, 845 (1986).[34]

¶ 36 As we stated in *Wolk*, when a court considers whether to bifurcate:

> The eventual decision should be the approach which is fair to both parties.
>
> Since the decision to bifurcate is discretionary, we will review lower court decisions pertaining to bifurcation by using an abuse of discretion standard. So long as the trial judge assembles adequate information, thoughtfully studies this information, and then explains his decision regarding bifurcation, we defer to his discretion. In other words, this determination should be the result of a reflective examination of the individual facts of each case.

*Wolk, supra* 464 A.2d at 1362. Thus, we require not only an on-the-record analysis of factors, but also a finding as to whether bifurcation would be fair under the circum-

---

**33.** In reality, however, "bifurcation of claims under the Divorce Code does not occur until the trial court enters a divorce decree while reserving economic claims for later determination." *Deitrich v. Deitrich*, 383 Pa.Super. 1, 556 A.2d 398, 402 (1989). This is not merely a matter of semantics.

**34.** However, the economic issues may not be fully resolved before the entry of a divorce

decree. *Geraghty v. Geraghty*, 411 Pa.Super. 53, 600 A.2d 1261 (1991). "The courts of common pleas are only empowered to make equitable distribution contemporaneously with or subsequent to a decree of divorce." *Waddington v. Waddington*, 425 Pa.Super. 241, 624 A.2d 657, 660 (1993), quoting *Campbell v. Campbell*, 357 Pa.Super. 483, 516 A.2d 363, 365–66 (1986) (*en banc*).

stances, prior to the entry of a decision. A determination on a petition for bifurcation must always be made in light of the policy of the Divorce Code:

> The family is the basic unit in society and the protection and preservation of the family is of paramount public concern. Therefore, it is the policy of the Commonwealth to:
>
>       \*        \*        \*
>
> (3) Give primary consideration to the welfare of the family rather than the vindication of private rights or the punishment of matrimonial wrongs.
>
> (4) Mitigate the harm to the spouses and their children caused by the legal dissolution of the marriage.
>
>       \*        \*        \*
>
> (6) Effectuate economic justice between parties who are divorced or separated and grant or withhold alimony according to the actual need and ability to pay of the parties and insure a fair and just determination and settlement of their property rights.

23 Pa.C.S. § 3102(a); *Wolk, supra.* Our object of review thus encompasses both the fairness of the trial court's decision in light of the aims of the Divorce Code as well as its record analysis. *Wolk, supra.*

■ ¶ 37 For this reason, we prohibit automatic or *pro forma* bifurcation and require the court to place on the record an examination of the fairness of any proposed bifurcation in light of the advantages and disadvantages of the procedure in that particular case, before the court determines whether or not to bifurcate the case. *Lambert v. Lambert*, 422 Pa.Super. 444, 619 A.2d 761 (1993); *Hall v. Hall*, 333 Pa.Super. 483, 482 A.2d 974, 978 (1984).

■ ¶ 38 The chief advantage to bifurcating the procedure and allowing a divorce decree to be issued before the economic claims are resolved is the acceleration of the divorce, enabling the parties to "begin the task of restructuring their lives," in accordance with the aims of the Divorce Code, so that "the marriage and each party's personal life are not held hostage to economic demands." *Wolk, supra* 464 A.2d at 1360–61.[35] There are also potential tax advantages for both parties. *Id.* at 1361. Additionally, it has been said that bifurcation encourages the parties to come to a settlement agreement of their own, which can save them both a great deal of money, as a settlement almost invariably costs far less in the way of attorneys' fees than does a full trial. *Id.*

■ ¶ 39 The entry of a bifurcated decree should have no effect upon the level of pre-divorce spousal support, which may be continued as alimony *pendente lite* at its pre-divorce level until the resolution of all ancillary claims. *McNulty v. McNulty*, 347 Pa.Super. 363, 500 A.2d 876 (1985); *Pastuszek v. Pastuszek*, 346 Pa.Super. 416, 499 A.2d 1069 (1985); Pa.R.C.P.1920.76. Nor does bifurcation affect the right to counsel fees. *Pastuszek, supra.*

■ ¶ 40 However, there are also potential disadvantages to bifurcation, and these must also be considered and ameliorated to the extent possible before a bifurcated decree in divorce is entered. The entry of the divorce itself usually changes the parties' economic circumstances and thus may delay resolution of the remaining economic claims.

> For example, there is little motivation to settle in the familiar fact pattern where the financially independent spouse who

---

**35.** As astutely pointed out by Joanne Ross Wilder in *Pa. Family Law Prac. and Proc.* (4 th ed.), "In this regard, the Divorce Code is at philosophical odds with past practice, which relied upon economic coercion to achieve fair results." Wilder at § 16–6, 193 n. 12. However, under our no-fault system, the fact that one of the parties is involved in an adulterous affair and wishes to remarry is a factor which weighs in favor of allowing her or him to do so by entry of a bifurcated decree. *Id.* at 190, citing *Katz v. Katz*, 356 Pa.Super. 461, 514 A.2d 1374 (1986).

controls virtually all of the marital assets and all of the information about them wants only to be divorced so that he can remarry. The device of alimony *pendente lite* in such situations can encourage settlements, but only in those unusual cases where the monthly payment is so high that it acts as an incentive to the payor to move the case to settlement in the hope that he will pay less in equitable distribution than in alimony *pendente lite*. In most cases, the financially independent spouse gains the most by delaying judgment day as long as possible. In such cases, it is the dependent spouse who is held hostage to economics.

Wilder, *supra* note 35 at 190. The cost in attorneys' fees to the economically dependent spouse of continuing the action for a greater period of time is another aspect of this pressure. Where the economically disadvantaged spouse has had difficulty obtaining compliance with discovery, bifurcation may provide an additional window of time within which the economically independent spouse may take the illegal but all-too-common action of hiding or otherwise disposing of assets, including business assets. Real estate that has been held as a tenancy by the entireties converts to a tenancy in common upon divorce pursuant to 68 P.S. section 501, changing inheritance tax provisions and causing greater vulnerability to attachment by creditors of one spouse, even though marital property remains *in custodia legis* so that the change does not affect the court's power to determine the parties' rights to the property. *Keystone Savings Assoc. v. Kitsock*, 429 Pa.Super. 561, 633 A.2d 165 (1993); *Klebach v. Mellon Bank, N.A.*, 388 Pa.Super. 203, 565 A.2d 448 (1989); *Jawork v. Jawork*, 378 Pa.Super. 89, 548 A.2d 290 (1988).[36] Divorce, with or without a subsequent remarriage, will often cause the automatic termination of spousal health insurance and "surviving spouse" pension benefits unless a pre-divorce provision has been made for some continuation of them.[37] Other disadvantages include the unavailability of joint federal income tax filing status, the deleterious effect upon life insurance policies naming the surviving spouse, and the risk that one party's death after the decree but prior to the resolution of economic issues might have a negative effect upon the surviving spouse's right to equitable distribution.[38] *Wolk, supra* 464 A.2d at 1361–62.

---

**36.** It should be noted that potential creditors whose liens pre-date the divorce proceeding (and whose existence may not always be known by both parties) are not usually on notice that the property may be subject to equitable distribution. *Krenzelak v. Krenzelak*, 503 Pa. 373, 469 A.2d 987 (1983). Courts are empowered to maintain entireties estates even after a divorce decree has been entered. 23 Pa.C.S. § 3507(a).

**37.** COBRA coverage (pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1986, 26 U.S.C. § 162(k), P.L. 99–272, Title X, 100 Stat. 82 (1986)) may last only for 36 months. If it is exhausted before resolution of equitable distribution, and no other coverage is available, insurance must be paid for directly; however, prior to a divorce, spousal health insurance may well be available for far less. Further, after divorce, a party is no longer a "surviving spouse" under the REA (the Retirement Equity Act of 1984, P.L. 98–397, 98 Stat. 1426 (1984)) for purposes of pension benefits under ERISA section 205

(the Employee Retirement Income Security Act of 1974, P.L. 93–406, 88 Stat. 829, 29 U.S.C. § 1001 *et seq.*), meaning that if the spouse with the pension dies after a bifurcated decree but prior to equitable distribution, there may be no means of the former spouse obtaining pension benefits, especially if the deceased spouse had remarried in the interim. *See also* Internal Revenue Code, 26 U.S.C. § 1 *et seq.*, as modified by REA and COBRA; Wilder, note 35 *supra*.

**38.** A divorce action abates upon the death of a party before the entry of a decree. *Haviland v. Haviland*, 333 Pa.Super. 162, 481 A.2d 1355 (1984). However, after the entry of a decree, any remaining ancillary claims survive the death of a party and may be pursued by the surviving former spouse, with the substitution of the personal representative for the deceased party. *Pastuszek, supra* ; 23 Pa.C.S. § 3323(d). Nonetheless, the Dead Man's Act causes disqualification if a witness has an interest in the outcome of the action; it is clear that the surviving spouse in an equitable

¶ 41 Many of the disadvantages of bifurcation may be avoided in advance by the practice of allowing bifurcation only upon the condition that potentially applicable disadvantages first be addressed and resolved by order or agreement. Wilder, *supra* note 35 at 192. *See also* Hon. Stephanie Domitrovich, "Utilizing an Effective Economic Approach to Family Court: A Proposal for a Statutory Unified Family Court in Pennsylvania," 37 *Duq. L.Rev.* 1, 34–35 (Fall 1998).

¶ 42 In the case at hand, the court and parties wisely used such an approach. Our thorough review of these agreed conditions, the record, and the history of the case itself as recited above, have together convinced us that the court did not abuse its discretion in granting a bifurcated decree. Judge Schmehl assembled more than adequate information as to the advantages and disadvantages of bifurcation in this particular matter, studied it thoughtfully, and explained his decision regarding bifurcation. His determination was the result of a reflective examination of the individual facts of this case. His decision was fair to both parties. Therefore, we defer to his discretion.

¶ 43 We do not evaluate bifurcation decisions based upon a trial court opinion for purposes of appeal, written after the fact; instead, we consider only whether a court complied with the mandates of *Wolk* prior to making its decision. We have found the court here did so. Nonetheless, we acknowledge that in the trial court's opinion, written after the decision was made, the court places too much emphasis upon the expressed desire of both parties to be divorced. This single factor does not override the consideration of whether bifurcation is, in the balance, a fair procedure for achieving part of the

desired end. Bifurcation can well be utilized where both parties have consented to a divorce but remain entangled in drawn-out negotiations of ancillary issues. In any event, the desire of both parties to be divorced was apparent from the time Husband's answer to Wife's complaint was filed, albeit on contested fault grounds.[39]

¶ 44 On appeal, Wife attacks the propriety of the bifurcation order largely on the grounds that the court improperly forced Wife to proceed without the assistance of counsel. This argument has no merit. The court clearly asked Wife whether she wished the court to order her attorneys to represent her at the proceeding. We do not, therefore, find the court forced her to proceed *pro se*. The testimony of Wife's attorneys makes it clear that Wife was aware that they would be withdrawing at least several days prior to the bifurcation proceeding. Wife was able to procure counsel to represent her at the Master's hearing the following month with one day's notice, despite her representations the previous month and the previous day that she would be unable to do so. This convinces us that she could well have found an attorney to represent her for the bifurcation hearing once she was aware her attorneys would be withdrawing, had she so desired. Under these circumstances, the court's choice to proceed with the hearing once Wife had chosen to "wing it," and its subsequent denial of her requests to continue the proceeding, were fully justified.

When a party chooses to represent h[er]self, as here, [s]he cannot impose on the necessarily impartial court or master the responsibility to act as the party's counsel and direct h[er] repeatedly how to proceed or to proceed for h[er]. When a

distribution proceeding, the most important witness, would be disqualified as having an interest. Wilder, *supra* note 35 at 193, *citing Kovach v. General Telephone Co. of Pa.*, 340 Pa.Super. 144, 489 A.2d 883 (1985).

39. Although Husband agreed for the first time at the bifurcation hearing that the marriage was irretrievably broken, this is not relevant to whether bifurcation is fair to the parties on balance, but only to whether proper grounds for divorce existed as of the time of the bifurcation hearing.

party decides to act on h[er] own behalf, [s]he assumes the risk of h[er] own lack of professional, legal training.

*Wiegand v. Wiegand,* 363 Pa.Super. 169, 525 A.2d 772, 774 (1987). *See Hein v. Hein,* 717 A.2d 1053, 1056 (Pa.Super.1998) ("Where a party's action disrupts the fair and orderly process of the divorce action, the court acts appropriately in imposing even severe sanctions if necessary to take control of the situation."). *See also Winpenny v. Winpenny,* 434 Pa.Super. 348, 643 A.2d 677, 679 (1994) ("Abuse of the court system, whether by seasoned attorneys or by *pro se* parties, cannot be tolerated."). Wife's *pro se* representation had no effect on the validity of the bifurcation hearing or order.

¶ 45 Wife also attacks the bifurcation on grounds that the court did not engage in a systematic and on-the-record inquiry at the hearing of the particular advantages and disadvantages of bifurcation as per *Wolk.* We disagree. The questions and answers set forth above demonstrate just such a systematic inquiry despite repeated outbursts from Wife. Moreover, due to the foresight of Husband's counsel and the court, several such factors were addressed to Wife's advantage within the bifurcation order itself, including the effect of Husband's death prior to final resolution, Wife's continuing medical benefits and reimbursement, and continuing alimony *pendente lite* of $630.00 per week plus $100.00 on arrears. Finally, Judge Schmehl has ably presided over this litigation since its inception. He was well aware of the circumstances and background of the parties at the time of the hearing. It was primarily Wife's disruptive behavior, reviewed in detail above, which precluded the court from exercising any greater degree of systematic analysis during the proceeding. However, what is before us is more than sufficient.

¶ 46 Specifically, as to the disadvantages of bifurcation that concerned us in *Wolk,* we believe the instant bifurcation order protects Wife's economic interests. In *Wolk,* we noted that the death of one divorced spouse could adversely affect the surviving spouse in the equitable distribution process. *Wolk, supra* 464 A.2d at 1362. That need not concern us here. Wife's interest in the marital property will be protected if Husband dies, since the bifurcated decree expressly states that any remaining ancillary and economic issues will not be dismissed but adjudicated against his estate in such an event. *See Taylor v. Taylor,* 349 Pa.Super. 423, 503 A.2d 439, 442 (1986) (the protection of wife's economic interest in marital property in the event of husband's untimely death, is a strong factor in affirming bifurcation order).

¶ 47 Secondly, in *Wolk,* we were concerned that bifurcation could lead to significant delay in the resolution of remaining economic issues. *Wolk, supra* 464 A.2d at 1361–62. However, at the time of the bifurcation hearing on February 17, a Master's hearing was already scheduled for the following month. Furthermore, there is substantial evidence that Husband intended to proceed in good faith to resolve all economic issues. He had presented Wife with several property settlement agreement proposals, all of which the trial judge found fair. At the bifurcation hearing, Husband testified that he would take no action to hide or dissipate marital assets. He also stated that he was not seeking bifurcation to avoid legal or economic obligations to Wife. For these reasons, we do not believe that the trial judge erred in finding that bifurcation would not lead to a delay in resolving the economic issues presented by this case.

¶ 48 In finding that the trial court did not abuse its power by granting bifurcation, we also note that Judge Schmehl was in a more than adequate position to rule on the ramifications of bifurcation, since he has presided over this litigation since its inception. In the past, we have found the fact that the trial judge had presided over the divorce proceedings from its early stages to be persuasive in affirming a bi-

furcation order. *Katz v. Katz*, 356 Pa.Super. 461, 514 A.2d 1374, 1381 (1986). Such a judge is in a position to be sufficiently familiar with the background and circumstances of the parties involved. *Katz, supra* at 1381. Judge Schmehl had presided over the instant divorce proceedings for four years prior to the bifurcation hearing. Taking into consideration the unique and complex facts of this case, its lengthy procedural history, and that many possible disadvantages to Wife were precluded by conditions in the bifurcated decree, we believe that Judge Schmehl did not abuse his discretion by granting bifurcation in this case.[40]

¶ 49 Wife also queries whether the trial court erred by acting after Wife filed her notice of appeal from the divorce decree. She specifically contests the court's orders approving and entering the Master's recommendation, and denying her motion for a continuance of the Master's hearing. We find merit to this issue. The trial court had indeed been divested of its jurisdiction to act by the filing of this appeal. We find it erroneously approved and entered the Special Master's recommendation, and we remand on this point. However, the trial court properly denied Wife's prior motion for a continuance even after this appeal was taken, for that was a matter of housekeeping.

¶ 50 The bifurcated divorce decree in this case was a final, appealable order, as discussed above. Therefore, according to Pa.R.A.P. 1701(a), the trial court was divested of jurisdiction to act after Wife had filed her notice of appeal:

(a) **General Rule**. Except as otherwise prescribed by these rules, after an ap-

peal is taken or review of a quasijudicial order is sought, the trial court or other governmental unit may no longer proceed further in the matter.

(b) **Authority of a trial court or agency after appeal**. After an appeal is taken or review of a quasijudicial order is sought, the trial court may:

(1) Take such action as may be necessary to preserve the *status quo,* correct formal errors in papers relating to the matter, cause the record to be transcribed, approved, filed and transmitted, grant leave to appeal *in forma pauperis,* grant *supersedas,* and take other action permitted or required by these rules or otherwise ancillary to the appeal or petition for review proceeding.

Pa.R.A.P. 1701.

¶ 51 Analogously, we find the trial court here retained jurisdiction to deny Wife's motion for a continuance of the Master's hearing. The facts amply support this decision. Wife filed a *pro se* petition for continuance late in the day just before the Master's hearing; however, the following day, Wife appeared at the Master's hearing represented by her attorney, made no mention of her continuance motion, was fully prepared to proceed, and did. We find Wife waived her *pro se* continuance motion by taking part in the Master's hearing without objection. Thus, the trial court's formal denial of Wife's continuance motion was merely an instance of "housekeeping" and was proper under Pa.R.A.P. 1701(b)(1). *See also Rosenberg v. Holy Redeemer Hospital,* 351 Pa.Super. 399, 506 A.2d 408, 414 (1986).

¶ 52 Conversely, we believe that the trial court improperly approved and entered the Master's recommendation by order

40. Wife relies mainly on our decisions in *Mandia v. Mandia,* 341 Pa.Super. 116, 491 A.2d 177 (1985) and *Hall v. Hall,* 333 Pa.Super. 483, 482 A.2d 974 (1984) to argue that the *Wolk* standard has not been met. In *Hall* and *Mandia,* we reversed husband's grant of bifurcation, finding the trial court had failed to consider adequately the ramifications of bifurcation in light of the *Wolk* standard at the bifurcation hearing. *See Hall, supra* at

977–78 ("[r]elatively little discussion is devoted to an examination of the potential consequences of bifurcation..."); *Mandia, supra* at 179 ("[t]here is simply no evidence on the record that the court gathered adequate information, thoughtfully studied that information and then explained its decision."). *Hall* and *Mandia* are distinguishable and do not control this case, in which the trial judge did engage in such a systematic analysis.

**650**

and decree. We recently held specifically that a trial court does not retain jurisdiction to enter and enforce a Master's report and recommendation of equitable distribution after a notice of appeal has been filed from a bifurcated divorce decree. *Prall v. Prall*, 698 A.2d 1338, 1341 (Pa.Super.1997). *See Mandia v. Mandia*, 341 Pa.Super. 116, 491 A.2d 177, 179 (1985) (after appellant lodged her appeal the trial court lacked jurisdiction to dismiss appellant's economic claims). The same applies here. The trial court entered the order approving the Master's recommendation only after Wife had filed a notice of appeal from the bifurcated divorce decree. At the time it purported to act, the trial court had been divested of jurisdiction in this matter. Its order is moot.

¶ 53 Where, as here, a bifurcated decree is on appeal, the claims over which the court has retained jurisdiction in the decree by way of bifurcation are not to be considered "ancillary" for purposes of Rule 1701. Where bifurcation is challenged, what is at issue is the propriety of the court's proceeding to consider these issues after issuing a decree. For this reason, the trial court may not proceed to consider them during the pendency of the appeal.

¶ 54 The trial court herein also erred in its assumption that the time had expired for Wife to file exceptions to the Master's recommendation. Pursuant to Pa.R.C.P.1920.55–2(b) and (d), any party may file exceptions to the report of a Master within ten days after the date the Master's report is mailed; however, if no exceptions are filed, the court is to review the report and, if it approves, the court is directed to enter a final decree and order including the report. Pa.R.C.P.1920.55–2(c). Wife filed her notice of appeal only a few days after the Master's hearing but *before* the report had been transcribed and filed. Thus, the ten-day statutory period had not yet begun to run at the time she filed her notice of appeal.

¶ 55 Therefore, upon remand, we direct the trial court to allow Wife the opportunity to file exceptions to the Master's recom-

mendation within ten days. Pa.R.C.P. 1920.55–2(c). We also direct the trial court to provide Wife notice of the beginning of this ten-day period.

¶ 56 In sum, we find the trial court did not abuse its discretion in bifurcating the instant divorce proceedings after fully considering the implications under *Wolk*. Additionally, we find that the trial court did not err by denying Wife's motion for a continuance of the Master's hearing. However, we reverse and remand the trial court's order entering and approving the Master's recommendation based on the court's erroneous conclusion that Wife had failed to file exceptions to the Master's recommendation.

¶ 57 Order affirmed in part and reversed in part. Case remanded for proceedings consistent with this memorandum. Jurisdiction relinquished.